Curia, per

Evans, J.
The testator, by his last will and testament, duly executed, and bearing date 16th day of June 1828, gave his whole estate to J. B. O’Neal], and appointed him sole executor. On the nineteenth of the same month, he wrote a letter to the executor, declaring the uses and trusts of the bequest in the following words.
“ I want Fan and Henry to be free ; I want Fan to have one half of my estate, and Henry the other half. When Fan dies, I want Henry to have half of Fan’s half, and you the other half for your care and trouble of them; and should Henry die, leaving no wife nor child, I want you to have the whole óf my estate forever. I want you to give Henry a good education, and do the best you can with him, and deal out his share to him as you think best, or as you think he will improve it. I want you to take Fan home with you, and build her a comfortable little house somewhere on your plantation, and let Fender and Cesley live with her as long as she lives.”
The testator died in 1837. This paper was propounded in the court of Ordinary for Union District, as the last will and testament of William B. Farr, and admitted to probate. The appellants, who are the heirs at law of the testator, and are his brothers of the half-blood, and the children of brothers of the whole blood, appealed from the decision of the Ordinary, to the Court of Common Pleas. The grounds of appeal are as follows.
1. That the paper propounded is not the will of William *82 B. Farr, but procured by the undue influence of a negro woman named Fan, the property of testator.
2. It was procured by fraud on the testator, and under circumstances of fraud on the law and the policy of the law.
3. By the threats and menaces of Fan.
4. It was revoked by a later will, bearing date the 17th August, 1836.
5. It was revoked by a codicil, dated 20th February, 1837, and by another writing, dated December 5th 1834.
6. It was not executed according to law.
7. It was a duplicate of a will which was burnt or destroyed by the testator.
On the trial of the case in the Circuit Court, the Jury found against the will, and this case comes up to the Appeal Court, on a motion for a new trial.,
There is no doubt, from the evidence, that the testator was of sound mind, and that the will was executed according to the requirements of the Act of 1789, 5 Stat. 106. The paper executed 5th December, was no revocation, because that was void for the want of three witnesses. There is nothing in the evidence which establishes any threats or menaces of Fan, of any other person, in procuring this will; or that it was procured by any fraud on the testator. The remaining grounds are, •
1. That it was procured by the undue influence of Fan.
2. That it is void, as against the policy of the law; and
3. That it was revoked or destroyed, by the subsequent acts of the testator.
These questions I shall now consider, with a view to determine if the verdict of the jury can be sustained, by either the law or the facts of the case.
In considering this case in reference to the undue influence alleged to have been exercised in the procurement of this will by Fan, it must be remembered that this will bears date the 16th June, 1828. Up to this time, the testator enjoyed good health, and had an unbroken constitution. Most of, if not all, the witnesses speak of him as a man of strong and vigorous mind, very self-willed, and not likely to be under the influence or control of any one. It *83 was not until 1832 that he became palsied ; and it was not until after that time that those scenes of drunkenness and violence occurred, which are so shocking to decency, and all our notions of propriety and- ¿subordination. Indeed, most, if hot all of them, were within'twh years of his death, which occurred in 1837. Except in a few solitary instances, Fan’s conduct was as submissive to his will as could well he expected from one in her condition. In refusing to let Nelly Brock and John Ferrel have bacon in exchange for a calf, and in payment of an account, she did set up her will in opposition to her master’s; and most of the witnesses thought she assumed' more .authority over the household affairs and the government of the negroes, than was becoming her condition as a slave.' That she had ceased, practically, to be a slave; that she shared her master’s bed, and was the mother of his acknowledged child, were circumstances which naturally led to that assumption of authority in the household affairs which was so offensive to some of Ihe witnesses.. But up to the time when this will was executed, it does not appear from the evidence, that, except in a solitary instance, she ever interposed her wishes in relation to the disposition of his property. That circumstance is related by McRay as follows. “ Farr said he would give Henry ten thousand dollars, and send him to a free State. The rest of his property he would divide among his relations, and would secure Fan her freedom. ■ Fan objected to the division among the relations. Farr said, if you are secure for your lifetime you ought to be satisfied; if Henry could not do on ten thousand dollars, he would not on a hundred thousand dollars.” That she derived from her situation a certain degree of influence, and that she was indulged in her wishes in the management of the domestic affairs, is very clear from the evidence. But the influence which in legal acceptation is called undue influence, is of a very different/ character. Perhaps no man has ever existed who was so entirely self-willed as to be wholly uninfluenced by the opinions and wishes of those with whom he was connected. Not merely in the ordinary affairs of life, but in the disposal of his property, even the sternest man is sometimes in *84 fluenced by the wishes and advice of a friend, a wife, or even an unworthy mistress, who has usurped, both in his affections and at his table, the place of his lawful wife. It has happened, and will happen again, that a mistress may so captivate the affections of her paramour, that he shall give her his whole estate, to the exclusion of his lawful wife and children. Such an act all would condemn, and concur in denouncing as immoral and improper the influence which produced it; yet, if it be done under the influence of affection merely, however unworthy the object- may be, such wills have been, and must be, supported, so long as the law allows a sane man to dispose of his property according to his own wishes. It has never been supposed to be essential to a will or deed, that the motive which led to the act should be virtuous, or that the object of the donor’s bounty should be meritorious, but it is essential that it should be the free and voluntary act of a sane mind. If, in making it, he has been influenced by “modest persuasion,” by arguments addressed to his understanding, or by appeals to his affections merely, the act is a valid one. If it be in conformity to his wishes, it is emphatically his will, and not the will of another, and we are bound to give it effect, without reference to the motive of the testator, or the unworthiness of the legatee, until the Legislature, upon considerations of public policy, shall think proper further to abridge the right of the owner to dispose of his property.
As to what shall constitute undue influence, I can add but little to what is said in the case of Farr vs. Thomson, Ex'or. Cheves, 37. According to the authorities, it must be so great as, in some degree, to destroy free agency; an influence exercised over the testator to such an extent as to constrain him, from weakness or other cause, to do what is against his will, but what he is unable to refuse. This influence may be obtained either by flattery, by excessive importunity, or by threats, or in any other way by which one person acquires a dominion over the will of another. The particular facts by which it is established, must, of course, arise out of each particular case, and must be left, to some extent, to the decision of the jury; but there must *85 be some evidence to support a verdict which takes away from a testator that right of disposing of his property after his death, which, with most men, is among the most cherished of the rights secured to us by laiv.
Whenever the validity of a will is disputed, the natural inquiry is, whether it is voluntary, whether it be conformable to his wishes -and his previously declared intention, and according to the course of his affections. When a sane man, with legal solemnities, executes a will, the law presumes, in' the absence of proof .to the contrary, that it was done voluntarily, and that it contains truly his wishes and intentions in relation to the disposition of his property. The burden of proof lies on him who alleges the existence of undue influence, and its exercise in the procurement of the will.
I have before said Fan was greatly indulged; and that she had some influence over the testator, arising out of her position, can scarcely be doubted.. From this arose her familiar mode of addressing him, her presumptious claim to be his wife, and her dominion over the servants and household affairs ; but beyond these, the evidence furnishes no proof of influence possessed or exercised, or attempted to be exercised, unless we can so regard the fact before stated from the evidence of McRay. At a period subsequent to the making of this will, and after his mind and energy of character were much impaired by drunkenness and disease, the evidence assumes a somewhat different character. Those scenes which are so shocking to decency and our ideas of the subordination of slavery, which are related by Ellen Brock, occurred in the last year of his life, and during fits .of mutual intoxication; and it was not long before his death, and under like circumstances, that Mr. Kelly came to the conclusion that Fan could have sold, or prevented the sale of, any of Farr’s negroes. All these facts were permitted to go to the jury ; and although this gave a semblance of support to the verdict of the jury which set aside the subsequent will of 1837, of which Dr. Thomson was Executor, they can have very little bearing on this case. When this will was executed, nine years before the testator’s death, he was a man *86 in the vigor of health and manhood, and, as all the witnesses say, of strong intellect and stubborn will. When the Thomson will was executed, he was enfeebled, both in body and mind, to some extent at least, by a stroke of the. palsy, and several years of drunkenness and debauchery. The woman, Fan, who had formerly been respectful and submissive to his will, had become, with him, a drunkard, and during the phrenzy of drunkenness, had even attempted violence on his person. But to infer undue influence from these facts, in procuring a will executed eight or nine years before, would be a farfetched conclusion, and at variance with the truth of the case. They were well calculated to excite in the jury disgust and abhorrence and to lead them off from the true points of the case to the consideration of Fan’s unworthiness, who was liberally provided for by the trusts of the will. As far back as 1822, the evidence establishes very clearly the intention of the testator, to dispose of his property mainly for the benefit of Henry, who was then his acknowledged child. Mr. Kelly said it seemed to be his “settled purpose.” In 1817, he expressed his intention to give his estate to his nephew, W. B. R.. Farr ; and occasionally, afterwards, an intention to provide for some of his relations, and especially for the children of his brothers of the whole blood; yet, he has frequently said that none of them should have any of his property. Every deliberate act which he performed, from 1822 to his death, except the gift to his nephew, W. B. F. Duff, in 1835, was declaratory of a settled intention to exclude his heirs at law, and to make an ample provision for his illegitimate child. Such was the provision of the will which he told Stokes he had made in 1821 or 1822, and of the will of which Hill and McKibben were executors, which, according to Dr. Thomson’s evidence, was as far back as 1823. The same may be said of the will now in controversy, and of the subsequent will of 1837. Even in those conversations in which he spoke of providing for his relations, after 1819, Henry seems to have been the chief object of his bounty, and his relations only secondary, except what is related by Ellen Brock, as having been said by Farr in the last year of his life. There seems to be *87 no doubt that, for many years before the testator’s death, the boy Henry was the object of his affection and extreme solicitude. He so said on many occasions,- and, according to the opinion of some of the witnesses, the boy was one that'a father might have loved: he was his child, but he was a slave, and the law did not allow him to be set free ; he was anxious to educate him and give him the status of a white man, but his respectably neighbors would not allow him to be sent to school with their'children. He sent him to a distant school, from which he was ejected, so soon as his caste was discovered, although his complexion was such that it required very close inspection to decide that he was not white ; and finally, he was exiled to a free State, to exempt him from liability to seizure as a slave, should his father die without accomplishing his emancipation. Under these circumstances, is it strange that the emancipation of his child, and a provision for him out of his estate, should have become subjects of much solicitude, and that he should have given to his executor, as he did in all his wills, a considerable portion of his estate as a purchase of his" fidelity, in the emancipation of. .his child from slavery, and giving him that position in society which is the consequence of freedom and wealth? So far, therefore, as the facts of the case are concerned, we can see nothing which resembles undue influence exercised by Fan in the procurement of this will.* It is of vast importance to society that the. rules of property should be fixed and certain, as far as practicable. Farr had an equal right with every other man to make a will; and this court will not permit this right to be taken from him by the verdict of a jury, without some evidence to support it.
Independent, however, of the facts- of this case, it is supposed the verdict must be sustained on certain legal principles hereinbefore stated. The first of these, which I shall consider is, whether the trusts of this will violate any' principle of public policy. What is or is not public policy, is matter of opinion, about which men differ as essentially on this subject as on any other. Until, therefore, the opinion of the community is embodied in the shape of law, we cannot regard It judicially. In 1828, *88 there was no law in existence prohibiting such a disposition of a man’s estate as is made by this will, and the trusts declared by the letter of the testator to the executor, written a few days afterwards. If it was a -valid will at Farr’s death, rights have accrued under it which cannot be taken away by subsequent legislation.
The 7th ground of the suggestion alleges, that this is'a duplicate of a will which was burnt or destroyed by the testator. There is no doubt, if a will be 'executed in duplicate, and one copy be destroyed by the testator, with the intention to revoke, it is an entire revocation of the other. But to give this principle any application, there should be some evidence that the will was executed in duplicate. The witnesses to the will say, there was but one copy executed; and if he afterwards had executed another, it would not be a duplicate, but a new will. No doubt the will Dr. Thomson copied from, when he wrote the will of 17th August, 1836, was an exact transcript of this, and that the testator had written his name in the margin, as he had done in the will now under consideration; but Dr. Thomson did not. know whether it was signed or attested by witnesses. Unless we take the assertion of the fact for proof, there is nothing to authorize the conclusion that there ever was a duplicate of this will. What Dr. Thomson copied from, was either the will itself, or a copy. No other conclusion is authorized by the facts.
The 4th ground in the suggestion is, that this will was revoked by the subsequent will, dated the 17th August, 1836, of which Dr. Thomson was appointed Executor. By the Act of 1789, no will, or clause of any will, is revocable but by a subsequent will or codicil or other writing, executed according to the provisions of that Act, or by concealing or destroying it. To say that a will, not signed by the testator or attested by three witnesses, could revoke a former will, would be to repeal the third section of that Act. Or, that a will executed when the testator was non compos mentis, or under duress from threats or undue influence, would be to revoke a good will, by an instrument wholly invalid and void, and to make a man die intestate, when it is clear he intended to die testate. Mental capaci *89 ty, and the free exercise of it, .are as essential' to the revocation as to the creation of the will. For the want of some of those requisites, the will of the 17th August, 1836, has been set aside, and judicially decided to be no will; and the principle is universally true, that an ineffectual attempt to make a new will, does not revoke a prior valid will. ;
The only remaining ground relates to the codicil or other writing of the 20th February, 1837. By this paper, after revoking a gift before made to his nephew, W. F. Duff, the testator -says, “also -, any other instrument of writing that I may heretofore have given, implying, signifying, or purporting any claim, right or lien on my estate, or any part thereof, even to one cent, I do now declare null and void and of no effect, except the within or annexed will, which is my true .and lawful will, and no other.” At the time of -the execution of this paper, it was not attached to any will. A short time after its execution, it was attached to. ,-the will of 1836, by Dr. Thomson,.under the direction of,the testator, by wafers. Thus áttached, they were found, in the testator’s possession at his death, and propounded to the court of Ordinary a,s the will of W. B. Farr. The Ordinary says — “the witnesses to both were examined. There was no separate examination about the codicil; they were regaided as one paper.” The Ordinary decided, that both these papers together, constituted the last will and testament of W. B. Farr. It is clear, from this .evidence, that the issue made up on the appeal from the Ordinary, involved the validity of the codicil, as well as the will, and that the verdict, in the case of Farr vs. Thomson, Ex’or. applies as much to the one as the other. This is manifest from the consideration, that although the will, when executed, might be bad, or the testator might be non compos mentis, or under duress or undue influence at its execution, yet, if he was sane and free from duress or undue influence when he executed the codicil, that would be a republication and confirmation of the will,, and would free it from the objection to which it was liable at its execution: As both papers were propounded together, and as the will could not be *90 void, unless the codicil which confirmed it was void also, it follows, of necessity, that the verdict of the jury, in Farr vs. Thomson, applies to both, and that both have been decided to be void; and, of course, according to the principles before stated, this codicil is no revocation of the prior will of 1828. In the argument, it was insisted that this paper of the 20th of February, 1837, was not a codicil, but the other writing spoken of in the Act of 1789. To the decision of this cáse, it is wholly immaterial by what name it is called. If it be an ineffectual attempt at revocation, it is liable to the same objections as like attempts made by wills and codicils. All are put on the same footing by the Act of 1789. I come; therefore, to the conclusion, that the verdict of the jury, setting aside the will of W. B. Farr, cannot be sustained on any of the legal grounds before stated ; and as it is not only against the weight ot the evidence, but wholly without evidence to support it, a new trial must be granted — and that is the unanimous opinion of the court.
Richardson, Butler, Wardlaw and Frost, JJ. concurred.